May it please the court, my name is Jenny Forbes, I'm representing Michelle Maliniak, and I'm here today, we are here today to urge the court to review de novo, the decision of the district court granting judgment as a matter of law on a claim that my client had against her former employee, employer, Tuscon Fire Department. There was an issue of timeliness in this case. There were some events that constituted what we regarded and ultimately the jury regarded as sexual harassment that occurred during the period that my client was assigned to Station 17, starting in 2004 and into 2005. There was testimony prior to, about the period prior to that pursuant to the Morgan case. We presented it as background information showing that during the course of my client's history with the Tuscon Fire Department, she had encountered various kinds of sexual harassment, a lot of it related to the use of bathrooms. Any evidence in the record that any of this offensive conduct, and I don't mean to downplay it in any way, was perpetrated by management or approved by management? Well, there wasn't record that any record, anything in the record that it was approved by management, but management was aware of this from a very, very early time. My client was one of the first women at the Tuscon Fire Department. She was indeed the first engineer. She drove the ladder truck, this huge truck at Station 1. And when she encountered issues with the bathrooms, and frankly, I think it's difficult to fault the department early on because of the bathroom issues. They didn't have facilities for women and they didn't have money to substantially restructure it. But getting to your question, my client went to the chief of the fire department and said in the presence of the HR person at that time that these were issues that had come up and that they needed to be addressed because she and other women in the department were feeling extremely uncomfortable about it. Was the jury instructed with regard, just a minute, to co-employee harassment? When the city was going to be responsible for harassment by fellow employees? We used the standard Ninth Circuit jury instructions about the city's and employers' liability for co-worker harassment. And that includes, of course, the elements of harassment itself, but also the fact that management knew or should have known in some way that the harassment was going on. And? And, frankly, that really wasn't issue here because I think everybody conceded that there was no question about management knowing that these things were going on, including the things that we were targeting at Station 17 for the period from 2004 to 2005 on. And I don't think here there really is any question about whether those prior, you know, the 2004-2005 incidents with the bathrooms and such are an issue of whether or not those were harassing conduct. The issue is really on the 17th, this event occurred, the last event, the only event that would make this complaint timely under Title VII. This is the offensive sign. That's right. The truck sign. The F-U, use reverts, B sign. And actually, a very, very violent sign when seen from the perspective of a woman who drives a vehicle for the department and lives basically 24 hours every other day. Your client brought that to the attention of management, didn't she? Well, she did. Or it was brought to the attention of management.  Absolutely. The day that it was. And didn't they promptly announce Fire Department-wide this was inappropriate, that an investigation was going to be conducted, and that if the persons responsible were determined, they would be terminated? Well, that- Isn't all of that true? There was a prior incident on the bathroom. That's exactly right. That's related to the bathroom. That is the bathroom incident that I think Your Honor is thinking of. Right. That occurred in mid-August of 2004-2005. And then what happened was, at that point, finally the department, through the chief, said to the department, we will have this no-tolerance policy. We will not tolerate men using the bathroom. The issue of Master Memo or whatever it is. That's that. Master Memo 52. Yes. The sign incident on the 17th of December is the one that had the botch or whatever it's testified to say. Right. I mean, if you look at the words, you look at the sign in the exhibit, I mean, your initial reaction is that means bitch. So the district court said the December incident, which is the only incident within the 300-day period- Correct. Just wasn't related to the prior incidents. Exactly. And therefore, you just can't make out a claim for a hostile sex claim. Correct. That under Morgan, it wasn't part of a continuing single- Right. Correct. So why was the district court's determination wrong under Morgan? And under this one, he did this under, you know, judgment not, judgment as a matter of law. Correct. Under 50B. Right. So we use the same standard as if this had been filed as a motion for summary judgment, in the sense that we look at the court, looks at the record anew, and it doesn't say anything about the benefit of the doubt in terms of, you know, the way that the- Well, the district court essentially ignored the bathroom sign. I'm sorry, Your Honor. He essentially ignored the bathroom sign. Isn't that what happened? I think he ignored the bathroom sign, but there were a couple of issues. Number one, I think for whatever reason, it doesn't – I don't understand why. He was looking even further back beyond the 2004. That looked like that was just an oversight on his part. Because it was clear. I mean, there was an instruction, a limiting instruction given early on that we aren't talking about that. That's only to let you know what happened before. What about forward? I mean, apparently when she came back, there were more bathroom incidents. Are you relying on that at all? No. No. That was part of the retaliation claim, and that was a claim that was judged adverse to my client. The jury decided she didn't prove her claim. And you didn't appeal that? No. I didn't appeal that for a variety of reasons. But the problem – the reason I think that the court below – the court below seemed to make a distinction between purely bathroom incidents. Right. And then these other things that were going on, like my client – having a firefighter who was below my client in the hierarchy ask his supervisor to watch my client because she wasn't doing any work. Well, here, this is not somebody that – you know, a firefighter doesn't get to demand that somebody observe or micromanage my client, especially somebody who is not her client. And that's the problem here, that a lot of what happened at least was said by the city to be, yes, harassing, but not sexual harassing, i.e., people didn't like her and that's what happened. And that's what the judge thought. But I think if you look at the constellation of circumstances, one of the reasons that they supposedly did not like her was that she was raising these issues. And you have to remember that this is a male-dominated living unit. This isn't as if we go to work 9 to 5 every day, although I doubt many of us do only that, but the truth is these people were living together. And so it was a much more difficult circumstance for women in that setting. And one of the reasons that she was being given such a hard time, not only because of the bathroom, but because with other issues like questioning her competence and undermining her self-esteem by statements that were made. But suppose – I mean, it's all very weird. I mean, suppose the city's position was that on shifts where there are no women, it's okay for men to use the women's bathroom. Is there anything wrong with that? Yes. Why? Because that's exactly what happened. And then the – But I want to know what's wrong with that. Well, because it was – Why is sexual harassment to let – apparently in some of the places they changed to unisex bathrooms, and then what? Actually, they didn't change. I think they eliminated the unisex bathroom. They made separate bathrooms. I thought – but I thought in some of the later workplaces, to deal with this problem, they made both bathrooms unisex bathrooms, which is what happens in restaurants these days, right? Most restaurants these days don't have male and female single-person bathrooms. They have unisex bathrooms. And that may be the way we're going anyway. But, no, I think what happened here was – But I want to know why it's sexual harassment. Because the men would leave the – That's different. It's not because the men were using the women's bathrooms. It's because they were messing it up. Yes. But they were doing it also deliberately, because despite being advised that they were not allowed to use those bathrooms, and despite complaints from the shift captains on my client's shifts, they were being – they were not monitored, and they were permitted to continue using the bathroom. And, actually, it turned into a situation where it almost seemed malicious. And that's another connection between what was going on with the bathrooms and the – and the truck sign. Because if you look at the shift schedule, which is 10, ER 10, and down at the right-hand side, you'll see that the very same shifts that were creating difficulty for my client and, actually, the other woman on B shift, they left that sign up over an extended period of time. The captains knew about it. And so even though it may not have been intended to target my client – This is the truck sign. The truck sign. Even though it may not have been intended to target my client, the effect of it was to add to this sexually harassing or gender-based harassing environment. And that's – that's another way that the truck sign incident is connected to the earlier conduct. And – And in general in this case, well, maybe except for the sign in the bathroom, we're talking about sex harassment, not sexual harassment. Exactly. We're not talking about purely, you know, propositions or sexual innuendo. We're talking about – But the bathroom sign was sexual innuendo of sort of – Oh, well, yes, it was. It was. It definitely was. But that's part and parcel of it, but that doesn't make it stand out because it's somehow different from the gender-based harassment. Did you have a claim that just the incident – just the incident on the 17th of December, that it's – that in itself was sexual harassment, didn't qualify? A single incident? I would – I – in my estimation, it would have – might have been very difficult to sustain that as sufficiently severe. No, that's what the jury found because it certainly didn't give a lot of damages. I'm sorry? The jury gave a very small damages award. Well, I think that – yeah, I think what it was was probably the year that she took off because of the last – that incident. She did have compensation during that year. I know, but it wasn't a – wasn't – isn't damages for sexual harassment usually – No, no, no. She was able to mitigate the damages. But it's usually not economic damages, right? Well, I – I don't know. Presumably, it's primarily non-economic damages, one would think. It's difficult to know. Well – So they could have relied simply on the last incident. It's possible. It's possible. It's difficult to know. You want to say the last – I would. Yes. Okay. Thank you. We'll hear from the City. Good afternoon, Your Honors. Counsel, may it please the Court. My name is Gary Cohen, and I represent the City of Tucson in this case. Before I turn to some opening remarks, I want to answer Judge Berzon's question that was suggesting that Judge Tshima entirely ignored in his decision the bathroom sign. I'm looking at his order, which grants the JMOL, and he specifically discusses that sign on pages 3 and 4 of his JMOL decision. So Judge Tshima did not ignore the bathroom sign. I'm sorry. Where – well, this is what I see him saying. He's saying – I apologize. It's on page – I misspoke, Judge. It's page 2, line 25. It's page what? Page 2 of his order granting the JMOL. Okay. He's specifically discussing the use reverse sign of December. He says that, but then when he comes later, he says there's that – the bathroom sign. Let's see what he said. I'm trying to find – he said something specific. He said on page 3, he says the truck sign incident bears not a shred of similarity to the bathroom incidents. That's exactly right. And he also – He was talking about there was no joking or gender joking or something like that. Yes. Correct. So the only point I'm trying – I just did – I wanted to clear that up. I wanted to make sure that nobody was left with the impression that Judge Tshima ignored the single and only timely filed claim in this case. Even if bitch is a gender derogatory term when directed from one man to another, there is still no evidence that any of the distant incidents, bathroom or otherwise, involve gender-related joking or the use of gender derogatory terms. And that's just not so. What's not so? The sentence I just read you. There's no evidence that any of the distant incidents, bathroom or otherwise, involve gender-related joking or the use of gender derogatory terms. There is no evidence of that. What about the sign? The bathroom sign. For me? Yes. The sign for me, that's not necessarily a gender term. That, to me, strikes of a sexual orientation. No men for me? The sign says no men, and some unidentified, anonymous person adds the words for me. Right. We don't know what that means. We don't know if that person's talking. We don't know who did it. It suggests that the people using this bathroom are lesbians, essentially, and they're not real women or something to that effect. That's certainly one possibility. So that's not gender-related joking? That, to me, is sexual orientation joking. Gender-related. Possibly, depending on how it's used and what they meant by it. But the point is that Judge Tashima did the – there's really only three facts that are important in this case. Number one is that the only timely – I must say, too, that I read your whole brief and you didn't deal with the sign, the bathroom sign at all, basically. You just ignored its existence. I thought that – I respectfully disagree. I believe that the brief discusses the fact that the sign in and of itself is not the type of act that rises to any level of independent discrimination. And in addition, that Judge Tashima correctly did the analysis that he had to do by law to determine whether or not there was an appropriate nexus between that incident and the prior instances. And he correctly concluded, and in great detail, why there's no such nexus. Judge Hawkins asked a question about whether or not – suggesting about who did this sign. Undisputed by the plaintiff in the briefs, undisputed that the people that wrote the use-reverse sign were not making those comments. Those comments were not meant for or directed at the plaintiff. There's no evidence that the people that made that sign had any involvement with the prior bathroom incidences. There's no evidence that the people that made the use-reverse sign had any problems with the plaintiff, any misgivings about her, anything having an issue between them. I thought Brunel was one of the subjects of the investigation of who did the bathroom sign. All of the people on the prior shifts. The entire – everybody that worked there was part of the investigation of the prior shift. There was no other. So here's what I guess I find troubling about what – so this was – the jury was given the question of whether or not this December 17th incident. The truck sign. The truck sign was related to the other incidents. Specifically in the jury, the first question they were supposed to ask, answer, was that question, yes or no. They said yes, looking at all the evidence that was presented. Now, Judge – the district court then comes along and says, well, under Rule 50B, the only possible result, the only verdict that the jury could have reached was that it was not related. And I don't see how you can come to that conclusion when you look at all the evidence. So for – and you have to look at the evidence in light most favorable to the jury's verdict, right? I agree. Okay. So when you look at the bathroom sign and you do it with that in mind, I don't know – you look at the – why couldn't the jury reasonably conclude that the bathroom sign was sex or sexual harassment? They did. But that's not the test. The test is what – No. We're in Rule 50B. You've got to remember, this is – what the district court did here was set aside the jury's verdict. I understand. I understand. And the judge has to engage in this very nuanced decision, based on Morgan and the other cases that have been cited, about whether there is a rational legal nexus between the only timely – Well, it's a factual nexus at core. Correct. Involving people that had nothing – no problems with Millenniac beforehand. There was never any issue with inappropriate language, the use of that term beforehand. Derogatory terms weren't the issue in the pre-300 days. The only issue at the end of the day – But what about the bathroom sign? It seems to me that you have a sort of a progression. You have, you know, the walking in the bathroom and all that stuff, which is, I'd say, you know, somewhat marginal by itself. All right? Then you have the bathroom sign. All right? Which seems to me is specifically a gender derogatory sign. Then you have another gender derogatory sign, put in a place where she was sure to see it. Let's at least acknowledge that. She was sure to see it. And having already seen another gender derogatory sign, which was identified as such essentially by management. Is that right? That much right? The part that it was identified as an inappropriate sign? Yes. It was an inappropriate sign. Right. So there was one inappropriate sign and then there was another inappropriate sign, both put in places where she was sure to see it. I agree with you on the bathroom sign. And I don't agree that it would be a sure thing that somebody in the Bay would see a sign on a reserve truck facing backwards that's never used. But I thought she just went to go to her own truck and there was a sign. No, that's not the facts of this case, ma'am. The facts of the case are that on a weekend, she and her partner, Mr. Holiday, were going to clean the trucks. Right. And that's the only, that wasn't her truck. She didn't use the reserve hazmat truck on which. I thought she was going to clean her truck and the other truck was sitting there. They went to go move that truck in order to clean it. So she wasn't going to clean. And they had to clean the truck. Correct. All right. And it was seen. We also have to keep in mind the context of what happened in between those two signs, which is after the for me sign, there was a, the memo comes out from the chief and definitively takes care of and for all intents and purposes ends that problem. That's all the law requires the city to do when there's a situation involving specifically harassing behavior. In this case, it was with regards to the bathrooms. The city has to respond in a reasonable manner. It comes out with Rule 52 memo, which instructs the definitively resolves that problem with the bathrooms, lays down what should be common sense, quite frankly, has some other broad language in that memorandum about we need to treat each other with respect, treat each other like you would your parents, and basically knock this off. And at that point in time, moving forward, there's no problem with the bathrooms anymore. The city has taken care of the problem. And there's a very, very interesting, that's important. I thought when she came back there were incidents again. Excuse me? I thought when she came back there were incidents again. Not with regards to the bathroom. I thought there was. She said there was. Okay. I don't recall there being any post-return bathroom issues. But even if there were, they're certainly not in play today. But the point is the statement in Duncan. And I would urge you to take a look at the language in Duncan. There's an interesting quote there where it says, and I'm going to quote this, there is no requirement that the city muzzle its employees before they make offensive statements. Rather, the burden placed on the city is to penalize harassing actions. When this situation with the bathrooms came to a head, the city took an action. It issued a memo. It told people clearly what the expectations were with regards to the bathrooms and had broad language otherwise. And there was no problem with that whatsoever. Now we jump forward four months later where it's undisputed that two people having nothing to do with the bathrooms, no problems with the plaintiff, did nothing harassing or discriminatory towards her whatsoever, make a joking sign that doesn't even use the words, by the way. It has symbols in there. They knew what it was. They testified what it was. They testified that it was their friendly way or their way of using the word bitch. They made that pretty clear. Biatch is what they're talking about, right? They also made it clear that that was another way of expressing the term bitch. Correct. And it says use reverse. They're talking to each other. Why didn't they just take the sign down after they played their little joke? Thank you for asking that question. The only person ‑‑ first of all, I don't know why they didn't take it down. The only ‑‑ there was a statement by ‑‑ It was well known that it was up, correct? By that shift. Yes. Management knew that it was up. And they left it up for a couple of days. Right. If there's a sign, I mean, I don't know why they didn't take it down. But I will say this, that if you have something, a sign, that in and of itself is not illegal, not taking it down also is not illegal. So while I wish that they would have taken it down, it would have been proper and professional, that sign in and of itself is not a Title VII violation. So not taking it down doesn't turn it into a Title VII violation. And you don't look at it in terms of is the sign itself a violation of Title VII. This was a gender harassment claim. Correct. Right? So you look at the whole period of time that's in play and all the acts and you ask whether it adds up. It's essential to creating an environment that is not conducive to work. With all due respect, the test is more nuanced than the general suggestion you just gave. You have to look at the constellation and specifically look at the people involved and the character of the acts and compare them as well, as well as the temporal timing of the incidences. It is striking, I would suggest to the Court, that in the reply brief filed by the plaintiff, she contests none of the cases we cite for the proposition I just asserted, Porter, Cortan, Wilkie, McGallum, Alfano. But I've just looked back at your brief and it's striking to me that in discussing the similarity you never talk about the bathroom sign. So, therefore, your use of the cases ignores what to me is the key fact here. Your Honor, our position in the brief, as well as today, is that Judge Tashima's order should be affirmed. That's what the brief is about. I know, but what I'm saying is you can't discuss the cases as to the similarities before and after and characterize the before as dealing only with use of bathroom issues and not with a sign in the bathroom, which is what you did in your brief. So it's not a useful discussion. I'm so sorry. I'm not following. You're trying to get us to say that we need to rely on certain cases and that she should have dealt with those cases. And I'm saying when you dealt with those cases and tried to see how they apply to the facts in this case, you ignored a key consideration. That being? I don't want to ignore anything. Bathroom sign, all the way through the brief. I've read it now. Okay. So therefore, it's just not a useful analysis because the question is, in light of the case law, is the fact that the other bathroom issues led to what was a, it seems to me, a gender derogatory sign. And we now have another gender derogatory sign apparently perpetrated by people on the same shift, i.e., the shift before her. It's a much closer connection than the one that you acknowledge. So the question is, is that a good enough connection, not the one you've been addressing? The answer to that is no. Because? And tell me why. Yeah, because there's cases that specifically talk about that. There's cases like McGallum which talk about sexual comments made directly to a plaintiff when she's on one department and then a generic, non-directed sexual comments coming by someone else in another department. But this wasn't someone else in another department. It was from the same shift. No, they're not from the same shift. Sure they are. Because the bathroom sign was there first thing in the morning. We don't know that. And it had to be from the immediately preceding shift. And this one was, I thought that's what, that's not a fair inference for the jury to make? The bathroom sign was found when they came on shift. We don't know when that sign was found. There's no evidence that the actors involved with the December 17th sign had anything to do with any misconduct. The jury couldn't infer from the fact that it was there when they arrived in the morning that it was put there by the people in the previous shift? No. No. That is complete speculation. It's a public facility open to the public. We don't know who did that. It's a public facility? The bathroom's in the fire station. I can just walk into the fire station and say, can I use the bathroom? Absolutely. Absolutely. It's a public facility.  It's a public facility. That's a new record. Okay. All right. Thank you, counsel. Over your time. You have about a minute and a half for rebuttal. Yes, Your Honor. And surprisingly enough, Your Honor, we were told that they are public facilities. I'd never thought of stopping into a firehouse when I needed to go to the bathroom. But anyway, a couple of comments. The captains clearly knew. All of the shift captains clearly knew what was going on because my clients, the captains on the B shift, informed them and tried to get them to cooperate and get their fire personnel to cooperate. The other thing is, ER Excerpts of Record 14, which is a memo prepared by those captains, Lee and Mazon, discusses the turmoil in Station 17. And I think that is evidence in and of itself that this turmoil, what we've been talking about, and what my client has complained about, persisted. Maybe not in the same type, but persisted. They still had difficulty. And then finally, in terms of not being able to identify the actors, the city did nothing to help my client and the other woman on the shift identify who these perpetrators were. They were told when there were feces or urine in the women's toilet without any evidence that a woman had used it, that they could go and do DNA evidence, but they weren't about to do that. In other words, the city did nothing about trying to identify who these people were. You're now talking about the time-barred bathroom incidents. That's right. Well, no, we're talking about the bathroom incidents during what we're calling the relevant period. So there was no effort made by the city to do an investigation which would reveal who these people were. And so my client said to go on the assumption it was people from other shifts because they didn't have problems with the people on their particular shift. And that's another reason for the connection between the bathroom sign and the truck sign. And in terms of this time part, Morgan is kind of funny this way. I mean, I gather the notion is that if it's a continuing violation, then the earlier ones aren't time-barred. You can rely on them. Well, it depends on whether it has to be. You can rely on them once you've, perhaps not for the fact that it's not time-barred, but once you've eliminated the stationary limitations problem, then you can rely on them. It becomes all part of the hostile work environment claim. I'm sorry. It becomes part of the hostile work environment claim. Yes, yes. I think there is a difficulty with Morgan, because then you get arguments like this which try to parse out different pieces of things, when the truth is you have to look at the oncology case, the constellation of circumstances, expectations, and relationships. And when you look at it. But it's a logically prior. I mean, the issue of whether there was a sexual, whether there was harassment is itself a cumulative thing. And then the question of whether it's within the limitations period is a slightly different cumulative thing, so it's kind of confusing. Yes. Yeah. I think Your Honor is correct. But here, as Your Honor pointed out, Justice Breyer, the jury made that determination. And it's their verdict which should stand. And for that reason, we believe the genie. Thank you, counsel. You're over your time. Thank you. And the matter is submitted. We appreciate your arguments, counsel. We'll go on to our last case for today.
judges: Hawkins, Paez, Berzon